The question of the constitutionality of the canal *Page 94 
act of July 10th, 1851, is directly presented by these cases, and must necessarily be decided. A decision against its validity will prove injurious to the interests of many persons, and disappoint the earnest wishes of many more. But this consideration, while it occasions regret on my part, detracts nothing from the obligation to preserve the constitution from infraction. The evil consequences to the community from an example of judicial unfaithfulness to that duty, would far outweigh the worst to be apprehended from a decision adverse to the canal act.
Before proceeding to the consideration of the principal question involved in these cases, it may not be amiss to advert very briefly to one or two topics which were urged upon our attention on the argument. For there may be found persons so little familiar with the grounds of judicial procedure, as to attach to them much more importance than they really deserve. These topics were presented to us under a great number of distinct heads, but are reducible to two. The one, that the governor and other state officers and two successive legislatures had been of opinion and had officially acted upon the opinion, that the act in question was not repugnant to the constitution. The other, that several gentlemen, occupying no official station, but of acknowledged learning and ability as lawyers and statesmen, had expressed opinions to the same effect. As to the first ground, although the action of the other departments of the government is always entitled to the respectful consideration of the judiciary, it can and ought to weigh nothing when it conflicts with their settled conviction of the requirements of the constitution. As to the latter ground, it seems quite obvious that we should be very forgetful of our duty, and of the obligation and responsibility officially imposed upon us, if we allowed our judgments to be swayed by the opinions of any number of men, however respectable.
Leaving these matters without further observation, let us turn to the main question which we are called upon to examine. The people of this state, in the exercise of their underived and sovereign authority, established the constitution. As part of the machinery of government under it, they created a senate *Page 95 
and assembly, and vested in them the legislative power of the state. The authority of the legislature is not inherent, but is entirely derived from and subordinate to the constitution. "The constitution is the basis of legislative authority; it lies at the foundation of all law, and is a rule and commission by which both legislators and judges are to proceed" (2 Dall. 304). If therefore an act of the legislature is contrary to any provision of the constitution, it can not possess the force of law. Ever since the formation of constitutional governments, this principle has on all proper occasions been asserted and enforced by the courts, and is now one of the acknowledged maxims and fundamental rules of the law.
The provisions of the constitution which bear most immediately upon the question before us, are contained in article 7, sections 3 and 12. The 3d section provides, that after paying certain expenses of the canals, and the sums appropriated by the first and second sections of the same article, not more than $200,000 shall be paid out of the surplus revenues annually to defray the necessary expenses of the state, "and the remainder of the revenues of the said canals shall, in each fiscal year, be applied in such manner as the legislature shall direct, to the completion of the Erie Canal enlargement, and the Genesee Valley and Black River canals, until the said canals shall be completed." Section "twelve provides, that "no debt shall be hereafter contracted by or on behalf of this state" (except certain debts specified in the 10th and 11th sections, which have no bearing upon the question under consideration), unless authorized by a law imposing an annual tax to pay the interest and provide for the discharge of the principal; such law to be submitted to the people at a general election before it can take effect. If it shall be found that the act in question purports to dispose of the remainders of the revenues of the canals, at a time or in a manner unauthorized by the 3d section, or that it purports to create a debt unauthorized by the provisions of the 12th section, then the act is void.
To look at the provisions bearing upon the first of these questions from the same point of view, and in the light of the same *Page 96 
facts as did the convention who framed the constitution, and the people who adopted it, will facilitate our arriving at a just conception of its meaning. In the years 1834 and 1835, the project of enlarging the Erie Canal began to be carried into effect. The financial policy adopted was substantially to apply the surplus revenues to the work and carry it on just so fast as the means thus furnished would permit. This policy was pursued until 1838, when another and wholly different course was adopted. It went upon the basis of considering the revenues of the canal as a fund to provide for the repayment of the principal and to pay the interest of moneys to be borrowed and applied to the completion of the work; and this is in substance the plan of the present canal act. Upon this plan the state proceeded till 1842, when, judging from the legislative action of that year, the scheme was found wholly to have failed.
When the convention assembled in 1846, these two financial schemes were fresh in the recollection of every one. That the difference between them is not formal, but of their very essence, may be rendered entirely apparent from a consideration of the results which would follow the adoption of each plan, taking, for the sake of illustration, certain assumed amounts for the revenues of the canals, and for the total cost of construction. These amounts are obviously wholly unessential, and in no way affect the principle of application. They are assumed, not because they are supposed to represent with accuracy the actual condition of the canals, or the probable results of the bill in question, but because they afford a striking illustration of the different results which may follow from the adoption of the one plan or the other. In order therefore to determine the question proposed, let us assume the annual remainder of revenues to be $500,000, and the total cost of completion $15,000,000. By the annual application of the remainders, the canals would certainly be completed in thirty years. What would be the result on the principle of anticipation adopted by the act in question? The annual interest on the loan of $9,000,000, at six per cent, is $540,000; the annual remainder applicable to its payment $500,000; and the annual deficit $40,000. So that *Page 97 
at the end of thirty years, instead of having the canals completed and no debt, they would still need an expenditure of $6,000,000 to complete them, and the amount of money owing, by reason of the deficiency of the remainders to keep down the annual interest, would have swelled up from $9,000,000 to $10,200,000.
It is obvious, therefore, that the difference between these two schemes is not formal or modal merely, but is a difference in their very nature and essence. Having fruits so widely different, they do present a choice, and we might not unnaturally expect that a convention or any other body having to act upon the subject, would perceive the difference, and signify their choice. Does the section in question show that the convention and the people did choose between these two schemes?
Whether we are considering an agreement between parties, a statute or a constitution, with a view to its interpretation, the thing we are to seek is, the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If thus regarded the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare, is the meaning of the instrument; and neither courts nor legislatures have the right to add or to take away from that meaning. This is true of every instrument, but when we are speaking of the most solemn and deliberate of all human writings, those which ordain the fundamental law of states, the rule rises to a very high degree of significance. It must be very plain, nay, absolutely certain, that the people did not intend what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision. On this subject Chief Justice Marshall says, speaking *Page 98 
of the constitution of the United States: "As men whose intentions require no concealment generally employ the wordswhich most directly and aptly express the ideas they intend toconvey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to haveemployed words in their natural sense, and TO HAVE INTENDED WHAT THEY SAID" (Gibbons v. Ogden, 9 Wheat. 188). To the same effect is the case of The People v. Purdy (2 Hill, 31, and 4 Hill, 384), upon the construction of that clause in the former constitution of this state requiring the assent of two thirds of the members of the legislature to every bill "creating, continuing, altering or renewing any body politic or corporate." The attempt in that case was to exempt municipal corporations from the provision. Bronson, J. dissenting from the judgment of the supreme court, says: "I do not so read the constitution. These words are as broad in their signification as any which could have been selected for the occasion from our vocabulary, and there is not a syllable in the whole instrument tending in the slightest degree to limit or qualify the universality of the language. If the clause can be so construed, that it shall not extend alike to all corporations, whether public or private, it may then, I think, be set down as an established fact that the English language is too poor for the framing of fundamental laws which shall limit the powers of the legislative branch of the government." "In this way a solemn instrument, for so I think the constitution should be considered, is made to mean one thing by one man, and something else by another, until in the end it is in danger of being rendered a mere dead letter, and that too where the language is so plain and explicit that it is impossible tomake it mean more than one thing, unless we first lose sight ofthe instrument itself, and allow ourselves to roam at large in the boundless field of speculation. For one, I dare not ventureon such a course. Written constitutions of government will soon come to be considered of little value, if their injunctions may be thus lightly overlooked; and the experiment of setting a boundary to power, will prove a failure. We are not at liberty to presume that the framers of the constitution, *Page 99 
or the people who adopted it, did not understand the force oflanguage." The judgment thus dissented from was reversed in the court for the correction of errors and Senator Paige, in his opinion in that court, says: "For one I can not consent to palter in a double sense with any part of the constitution. Through no agency of mine shall it be made to keep the word of promise to the ear and break it to the hope. I trust that the court will not hesitate to array itself in favor of the old and revered doctrine of strict construction — the only sound and safe doctrine for the government of either judges or legislators. If courts are allowed to depart from it, and venture upon the perilous experiment ofsubstituting, for the clear language of the instrument, theirown notions of what it ought to have been, or what its framersintended, there will be an end of written constitutions, and of all attempts to fix limits to legislative and judicial power."
Applying these principles to the section in question, we are unable to see that the words "in each fiscal year," are not placed in such connection with the residue of the sentence, as to convey the meaning which the convention and the people intended. We see no ground for thinking that a different arrangement of the words of the clause would be better calculated to express that meaning, and no ground for altering the arrangement, except a dislike of the meaning which is now clearly conveyed. The words in question, placed where they are, are full of significance, and say as plainly as language can, that the application of the remainders of revenue to the enlargement and completion of the canals, is to be made in each fiscal year, until their completion. The convention and the people have then chosen between the two schemes of finance of which we have spoken, both of which had been tried and their results ascertained. Taught by experience, they selected that scheme which they saw ensured success, avoided debt and facilitated economy — the scheme of paying as the means of payment should be produced from the revenues of the canals.
It is however contended, that conceding the words "in each fiscal year" to be so placed as to convey the meaning which *Page 100 
the people and the convention intended, the whole clause taken together confers upon the legislature entire discretion over the manner of applying the revenues to the enlargement and completion of the canals. That although this application is directed to be made in each fiscal year, yet the scheme of the canal act is one mode of thus applying these revenues. That, therefore, as the whole subject of the manner of application is within the discretionary power of the legislature, the particular manner adopted in the act is necessarily constitutional.
If the words of the constitutional provision had been "in such manner as the Canal Board shall direct," no one would have supposed that board entrusted with the power to get up such a financial scheme as the act in question contains. No one would have doubted that the clause fixed, in the first place, the thing to be applied, viz.: the remainders of revenue; next, the object to which they were to be applied, the enlargement and completion of the canals; and next, the time of application "in each fiscal year until the canals shall be completed." And no one would have hesitated to admit that the discretion conferred by the use of the words "in such manner as the canal board shall direct," had reference to other points than those which had thus been fixed. Now it was never heard of as matter of law that the character of the agent had any thing to do with the extent or nature of the power conferred upon him That depends altogether upon the terms in which it is conferred, and not at all upon the character of the agent. This proposition is abundantly plain, and in general terms would scarcely be denied by any one. Yet the position we are examining is founded upon its practical denial, on the notion of the sovereignty of the legislature, which, although entirely accurate in reference to the parliament of Great Britain, as to which body it was first announced, has a very limited application to legislative bodies existing under and subject to the provisions of a written constitution. That the legislature possesses the legislative power of the state under the constitution is true; but this does not touch the question of the extent of that power. That depends upon the restrictions which the *Page 101 
constitution has imposed; because, subject to those restrictions, the whole legislative power of the state is granted.
In respect to the revenues of the state, the legislature has not been entrusted by the people with unlimited power. On the contrary, the limitations to be placed on its power seem to have called for and received the anxious attention of the convention. The whole scope of the 7th article of the constitution manifests the most careful purpose to assign limits to a power which would otherwise be unrestrained. These restrictions, it is to be remembered, are imposed by the sovereign power upon one of the agents it has constituted to carry on government. We are not at liberty to think that restrictions upon the power of the legislature are unnecessary. The fact that such restrictions are contained in the constitution under which we sit, is, for us, conclusive proof that these restrictions are necessary. Nor can we regard them as unwise, or against a liberal and enlightened policy, and therefore to be evaded or construed otherwise than according to the spirit and policy of the provision themselves. If that policy differs from any other line of policy, then the latter is that which we are bound to avoid. The policy of the constitution is, for us, liberal enlightened, wise, and must be sustained by us so long as it remains embodied in the fundamental law.
Under the constitution, the thing to be applied to the enlargement of the canal is revenue — money. It is that which is to be applied; not something else, the product of the use of that money. It is to be applied, moreover, in each fiscal year.
The application is not to be delayed by accumulation, nor hastened by anticipation, but is to proceed year by year, using the revenues of the year for the work of the year, until the canals shall be completed. We are not at liberty so to construe the discretion conferred on the legislature as to the manner of application, as to bring it into conflict with the time of application which the constitution expressly specifies. The act in question provides that after 1854, the remainder of the revenues shall be applied, not to completing the canals, nor conditionally in case the canals shall then be completed, but *Page 102 
absolutely to the creation of a fund to pay canal revenue certificates and interest thereon. If the canals should not be completed before that period, then the act and the constitution are directly in conflict; the one declaring that the revenues shall be applied to the completion of the work, the other that they shall be accumulated in a fund for paying the certificates.
We might with entire confidence rest the determination of these cases upon the grounds which we have already considered; but we think it proper also to consider the question whether this act does not purport to authorize the creation of a debt against the state, within the meaning of the prohibitions contained in the 7th article of the constitution. In considering that question, we will for the present omit to take into account the latter part of the 14th section of the canal act, because, if that has the effect ascribed to it by the counsel who maintain the constitutionality of the law, then it matters not what obligation the residue of the act seems to create, though it be the incurring of a debt in the most direct and unequivocal form. Even if the act and the certificates contained a positive promise to pay, and a pledge for payment of the faith of the state and of all its revenues, this clause in the 14th section would, in their view, prevent the act from being unconstitutional. Confining our attention at present, however, to the inquiry, what obligations, if any, are assumed by the state in case the provisions of the act are constitutional, let us consider the extent and nature of those obligations. For if the act creates any obligation which is to be regarded as a debt, within the meaning of the constitution, then even if we might have thought the scheme a mode of application, within the meaning of the 3d section of the 7th article, looking at that section alone, we should nevertheless be bound to construe the two sections together, and hold that the 3d section did not intend to authorize what the 12th section forbade.
If language has any meaning, the legal effect of the act, if valid, is at least to devote so much of the surplus revenues of the canals as shall actually be received after 1854, to the creation of a fund to pay the canal revenue certificates and the *Page 103 
interest thereon. If this can be don in regard to one source of revenue, we see no reason why the same thing may not be done in regard to every source of revenue of the state, including not only all revenue which may arise from property, but also all which may be realized by the exercise of the power of taxation. Such an anticipation of revenue would no more create a debt than this bill does.
It may be objected that there is a distinction between a pledge of the revenues of property owned by the state and of the revenues to be derived from taxation; but the distinction does not affect the question. Whatever consumes the revenues of the property of the state, tends to render a resort to taxation necessary just to the extent to which the revenues from property have been consumed. It is therefore a matter of entire indifference whether one or another part of the resources of the state is drawn upon; for the substantial effect upon the financial condition of the state is the same in either case. If the constitutional provision against incurring debts permits such a scheme as this to be effectual, it is of small moment to inquire what it prohibits; for it provides no practical restraint whatever upon the power of the legislature. To attribute such an intention to the convention or to the people as to permit the one and prohibit the other, is to attribute to them an entire incapacity to comprehend the subject on which they were acting, and the effect of their own language. It is construing the constitution as if it were a penal statute, or a disfavored agreement in conflict with public policy, rather than as being the supreme law of the state, prescribed by the immediate source of all authority, to set bounds to the power delegated to its agents. We might on this branch of the subject rely wholly upon the plain sense of the constitutional provision in question; but a brief examination will serve to show that the obligations which purport to be created by this act constitute in its ordinary sense a state debt.
National or state debts assume a great variety of forms. Sometimes they take the most usual form of private debt — an obligation to pay the principal at a specified period, with interest *Page 104 
in the mean time. Sometimes the period of payment of the principal is wholly at the election of the government; while at others the government is at liberty to pay at any moment after a fixed period. Sometimes the principal is not to be paid at all, but only a perpetual annuity, and sometimes only an annuity dependent on a life or lives, or for years. In short, these obligations assume every form which can tempt the possessor of money to part with it to the government, and are varied from time to time as one or the other seems most likely to accomplish the purpose of putting out promises and getting money in return. In all these forms, one common attribute is found, and one only; viz: that in consideration of money advanced to the state, the state promises whatever it is thought will be most likely to procure money to be advanced, it matters not what; and that which is thus promised is a debt. It may relate only to the income of particular property, or it may embrace the whole resources of the state. The extent of the obligation does not affect or qualify its nature. So long as there is an obligation assumed by the state, it constitutes a debt — something due from the state.
Again, if in the natural and expected course of events a period will come when the promises made by the certificates in question will ripen into a perfect obligation on the part of the state, then the issue of them conflicts with the prohibition of the constitution as clearly as if the debt arose immediately upon their being signed. When remainders of revenue from the canal shall have been received into the treasury of the state after 1854, the obligation of the state will have become perfect to pay upon these certificates the amount so received. It is true the payment can not be made without further legislative action, nor could it be if the certificates were immediate and general obligations on the part of the state. An appropriation is always necessary to effect actual payment, but the obligation is as complete without the appropriation as with it.
There is another view in reference to the obligations assumed by the state, which clearly shows that they amount to a debt. The 9th section of the act appropriates $540,000 to pay *Page 105 
interest during the first two years. We have then the certificates containing, in conformity with the 2d section of the act, a promise to pay interest semiannually, and an appropriation to pay that interest. If this does not make a complete and perfect obligation, I am at a loss to conceive what would. It is true that the constitution authorizes appropriations for two years, but it does not authorize the creation of debts, and we are not at liberty so to construe the power to make appropriations as to bring it in conflict with the prohibition against creating debts. The appropriation in this case is to be taken in connection with the promise to pay contained in the certificates, and the scheme of raising money in which they form part of the machinery. Thus viewed, the certificates, so far as the two years interest in concerned, are as complete obligations of the state to pay money, as the promissory note of an individual is an obligation upon him to pay money. It is, however, to be observed that the 9th section, which makes the appropriations in question for the payment of interest, directs the payment to be made out of the avails of the sale of the certificates, the premiums thereon, and the interest which may have accrued on the deposit of such avails. On the other hand, the 8th section, which contains the appropriations for two years' work upon the canals, directs the payments to be drawn from the same sources, and also from the surplus revenues. If the appropriation to the payment of interest had been directly from the general resources of the state, we have seen that a debt would result. Does this indirect process alter the effect? The moneys arising from the sale of certificates are, when received, the property of the state. They can be paid out only in virtue of an appropriation by law. The persons who paid them to the state for certificates, no longer retain any interest in or control over them. The only ground on which a distinction can be suggested between payment from these funds in the hands of the state, and from its general resources, is that such payment is refunding part of the price of the certificates to the purchaser. Besides the answer that the transaction was not originally a sale of the certificates (for an advance of money on the original *Page 106 
uttering of an obligation for the payment of money, is never a purchase of the obligation, but always a loan), it is sufficient to say, that the ground taken is not warranted by the provisions of the act. The amount which is to be repaid to the purchaser or lender, for principal, is not diminished by these payments under the appropriation in question. It is not part of what he advanced which he is receiving back, but a compensation for the use of what he advanced. This compensation being payable by the state in all events, creates a debt within the narrowest definition of that term which was pressed upon us at the argument.
It remains to consider the effect of the last clause of the 14th section of the act. This provides as follows: "The certificates to be issued under the act shall in no event or contingency be so construed as to create any debt or liability against the state, or the people thereof, within the meaning of section twelve, article seven of the constitution." The section of the constitution referred to had already rendered it impossible that the certificates should create any debt or liability against the state or the people, and a legislative provision of this sort was not necessary for the protection of that instrument. Is its effect to preclude us from inquiring whether the certificates, or the provisions of the act taken in connection with the certificates, purport to create a debt or liability against the state or the people thereof? We think not. It does not alter, or profess to alter, any one provision of the act. It leaves them all standing on the statute book, with the apparent force of law, and with the sanction of legislative approval, forming together a single scheme for raising money, on the faith of which capital is invited to assist the state. Under this state of things, can we be asked to take the ground that the state is to be regarded as coming into the money market, with a cunningly devised plan of promises, seemingly efficacious, but really known to be wholly unlawful and incapable of conferring any legal right, and by such means seeking to procure the advance of money? The respect which we owe to the legislature forbids us to listen for one moment to the suggestion. The clause in question is *Page 107 
only a legislative declaration of the meaning of the constitution and an injunction upon the courts to construe the act accordingly. If it were to be regarded by us, and such effect given to it as is contended for, then the most flagrant legislative violations of the constitution may always be screened from the scrutiny of the courts by the addition of this simple clause. A single illustration will suffice to make the position plain that this clause is not to be regarded in considering the validity of the act. Let us suppose an act of the legislature directing that A may make his certificate stating that a mortgage from B to C is satisfied, and that upon such certificate being filed in the county clerk's office where the mortgage is recorded, the same should be satisfied and discharged of record; and further adding, that said certificate should not be construed to impair the obligation of a contract within the meaning of the constitution of the United States. Does any one think that such a law could be enforced, or that such a certificate would be any more efficacious to discharge the mortgage than a sheet of blank paper? Its absurdity is too plain to admit of argument. Yet this is the very case which we are considering.
In conclusion, we have seen that the act under consideration, in its material provisions and general scope, conflicts with the constitution of the state. Its provisions constitute a single financial scheme, and must stand or fall together. We have not been entrusted with the power of determining whether the policy of the constitution is wise or not. Nor has any discretion been given to us to enforce its provisions, or to refrain, as we may think the public welfare demands. Our duty is simply to declare what we believe to be the law, viz: that the act in question, being repugnant to the constitution, is void.
The judgment of the Supreme Court should therefore be reversed, and the mandamus refused.